1

2

3

4

5

6 **IN THE UNITED STATES DISTRICT COURT**

7 **FOR THE DISTRICT OF ARIZONA**

8

9 Jerome Lee Pringle,                                    No. CV-14-00811-PHX-PGR (JZB)

10                      Petitioner,                       **REPORT AND**
                                                          **RECOMMENDATION**
11 v.

12 Charles L. Ryan, et al.,

13                      Respondents.

14

15 TO THE HONORABLE PAUL G. ROSENBLATT, UNITED STATES SENIOR

16 DISTRICT JUDGE:

17        Petitioner Jerome Lee Pringle, who is confined in an Arizona Prison, has filed a

18 *pro se* Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. (Doc. 1.)

19        In 2011, Petitioner pleaded guilty to First Degree Murder and Theft of Means of

20 Transportation in exchange for the dismissal of a death-penalty allegation and the

21 promise that the trial court could choose between a natural-life sentence and one that

22 included the possibility of parole after 25 years of imprisonment.  After a three-day

23 sentencing hearing, the trial court sentenced Petitioner to a natural-life term of

24 imprisonment. Petitioner subsequently asserted in the state courts, as he does now, that

25 (1) counsel was ineffective for advising him to accept the plea; (2) his confession was

26 improperly obtained; and (3) the State presented insufficient evidence to support the

27 charge of first-degree murder.  Petitioner now requests he be permitted to plead to

28 second-degree murder. Because the state courts' determination was not an unreasonable

application of federal law, the Court recommends that the Petition be denied and dismissed with prejudice.

## I.   BACKGROUND

### a.  Facts of the Crimes

The Presentence Report includes a summary of the underlying facts of Petitioner's crimes:[1]

> On July 11, 2009, at approximately 12:48 a.m., officers were dispatched to the victim's residence, located in the vicinity of west Camelback Road and north 75th Avenue in Phoenix, AZ, regarding unknown trouble. When the officers arrived, they met Joe Pringle outside. Mr. Pringle was hysterical and stated that when he arrived at the home he shared with the victim, Alice Saunders, he discovered Ms. Saunders in the master bedroom, laying on the floor, with blood on her head and she was not moving. Mr. Pringle stated Ms. Saunders' car was missing from the carport, as was his brother, Jerome Pringle, who lived with them. When officers entered Ms. Saunders bedroom they discovered her lying on the floor in a blood soaked comforter, with what appeared to be brain matter at the end of the bed. There was blood spattered throughout the bedroom on the bed, walls, mirrors, and floor. Ms. Saunders, age forty, was pronounced dead at 12:55 a.m. by officers.

> Felicia [R.], Alice Saunders' daughter, arrived at the scene and told officers she last spoke with her mother between 11:00 a.m. and 11:15 a.m. on July 10, 2009. Ms. Saunders told her daughter she had been in a physical altercation with the defendant, as Ms. Saunders believed the defendant had taken her stereo. Ms. Saunders told her daughter that she asked the defendant to leave and started walking him to the door. The defendant had pushed her, and she in turn hit him. [Felicia] said Ms. Saunders and the defendant frequently argued about the defendant staying in the house. During a previous incident, the defendant attempted to spit on Ms. Saunders, but his spit missed Ms. Saunders and landed on the floor. The defendant pointed at the spit and told Ms. Saunders that was the location where he would kill her.

> On July 11, 2009, at approximately 7:20 p.m., Tucson police responded to an AM/PM convenience store, located in Tucson, AZ, in reference to a report of a man wanting to turn himself into police for killing his brother's girlfriend earlier that day. The store clerk reported that the defendant entered the store to make a purchase, and started crying. The clerk

---

[1] In Arizona, the factual basis for a guilty plea "may be ascertained from the record including presentence reports, preliminary hearing reports, admissions of the defendant, and from other sources." *State v. Varela*, 587 P.2d 1173, 1175 (1978).

1
2
3
4
5
6
7

accompanied the defendant outside, and the defendant told the clerk he had gotten into an argument with his brother's girlfriend and beat her in the head until she was dead. The defendant told an officer he killed his brother's girlfriend in Phoenix, AZ that morning. He and the victim were always fighting, and he went too far that day and killed her. Officers discovered some of the defendant's clothing and shoes in a vacant field behind the store, and noted some of the clothing and shoes appeared to have blood spattered on them. The defendant told officers he left Ms. Saunders' vehicle on the other side of the freeway, where it was recovered on a street close to the freeway. The defendant was arrested and held until Phoenix Police transported him back to Phoenix.

8
9
10

An autopsy was performed by the Maricopa County Medical Examiner Office. It was determined Ms. Saunders died from multiple blunt force and sharp force injuries, and Ms. Saunders' throat had been cut.

11   (Doc. 22-2, Ex. N at 1–2.)

12         Detective Cisneros interviewed Petitioner after his arrest.  (Doc. 22-5, Ex. O at

13   166-204.) At the beginning of the interview, Detective Cisneros read Petitioner his

14   *Miranda* rights, and Petitioner indicated that he understood those rights.  (*Id.* at 168.)

15   During the interview, Petitioner stated that: (1) he was "always" arguing with Alice; (2)

16   on the night she died, she "kicked" his bedroom door in, was questioning why he was at

17   the house and why he didn't have a job, and spit in his face; (3) he then went and kicked

18   the door, picked up his brother's mallet and "started hitting her, and hitting"; (4) the

19   mallet police found could have been the mallet he used; (5) he hit her between six and

20   eight times; (6) he stabbed her neck because "she wouldn't die, she was hurting and [he]

21   just, [he] was like, come on . . . die"; (7) he left the mallet/hammer and knife at the house;

22   (8) he might have left the mallet/hammer in the backyard; (9) after hitting her and

23   stabbing her with a knife, he sat on the floor, smoking, just looking at her; (10) he and

24   Alice had a "horrible relationship"; (11) he and Alice had previous "altercations,"

25   including one a month prior to Alice's death; and (12) he took Alice's car without her

26   permission.  (*Id.* at 168-71, 180-90, 199-201.)  That same day, Detective Cisneros also

27   interviewed Alice's daughter, Doc. 22-5, Ex. O at 84-105, and the Medical Examiner

28   who examined Alice's body, Doc. 22-5, Ex. O at 107-65.

- 3 -

## b.  Trial Proceedings and Guilty Plea

On July 20, 2009, Petitioner was indicted by a Grand Jury for one count of First-degree murder and one count of theft of means of transportation.  (Doc. 22-1, Ex. A.)  The State alleged aggravating factors were present, including that Petitioner had two historical prior felony convictions.  (Doc. 22-1, Ex. C, Ex. D.)  On December 8, 2009, the State filed a Notice that it intended to seek the death penalty because Petitioner "committed the offense in an especially heinous, cruel or depraved manner."  (Doc. 22-1, Ex. F.)

On September 20, 2010, Petitioner's trial counsel submitted a request to the County Attorney's Office, proposing that Petitioner plead guilty to a second-degree murder (Doc. 22-2, Ex. N. at 65-69.)  The prosecution rejected that proposal.  (Doc. 22-7, Ex. FF. at 5.)  Petitioner's trial counsel then proposed a plea agreement where Petitioner would plead guilty to first degree murder with a life sentence with eligibility for release after 25 years.  (*Id.*)  The state also rejected that offer.  (*Id.*)  On February 2, 2011, the parties reached an agreement, in which Petitioner agreed to plead guilty to first degree murder and theft of means of transportation.  (Doc 22-1, Ex. M at 80-82.)  In return, the State agreed to withdraw its intent to seek the death penalty count and to dismiss the allegation of historical prior convictions.  (*Id.* at 1.)

The parties' written plea agreement set forth the sentence range for each count— life or natural life for the first degree murder count and between 2 to 8.75 years for the theft count (if there's an exceptional circumstances finding)—but the parties had no specific agreement as to the sentence that Petitioner would receive under the agreement. (*Id.*)  The plea agreement also contained the following language:

> Unless this plea is rejected by the Court or withdrawn by either party, the Defendant hereby waives and gives up any and all motions, defenses, objections, or requests which he/she has made or raised, or could assert hereafter, the Court's entry of judgment against him/her and imposition of a sentence upon him/her consistent with this agreement.  The Defendant acknowledges that by entering this agreement he/she will have no right of direct appeal (A.R.S. § 13-4033).

(*Id.* at 2.)

1   Also on February 2, 2011, Petitioner appeared at a change of plea hearing in

2   Superior Court.  (Doc. 22-8, Ex. HH.)  During the hearing, the Court: (1) confirmed that

3   Petitioner signed the agreement and initiated next to each paragraph; (2) confirmed that

4   by initialing each paragraph, Petitioner affirmed he had read the agreement, understood

5   it, and agreed to its terms; (3) confirmed that Petitioner did not have any drugs, alcohol,

6   or other medications in his system during the hearing; (4) confirmed that Petitioner was

7   pleading guilty to Count I and Count 2; and (5) explained to Petitioner, and confirmed

8   that Petitioner understood, the potential maximum penalties for the two Counts to which

9   he was pleading guilty, including a life sentence for Count I and the sentencing range of 2

10  to 8.75 years for Count II.  (Doc. 22-8, Ex. HH at 11-14.)  The Court further explained to

11  Petitioner that he faced anywhere from a natural life sentence to a life sentence with the

12  possibility of release after 25 years.  (*Id.* at 15.)  Petitioner stated that he understood that

13  potential sentence.  (*Id.*)  Finally, the Court further confirmed that Petitioner understood

14  that by entering into the plea agreement, he was giving up several constitutional rights,

15  including: his right to be presumed innocent; his right to have the government "convince

16  a jury beyond a reasonable doubt on each element of each charge"; his right to a jury

17  trial; his right to be represented at trial; his right to cross-examine the state's witnesses;

18  his right to subpoena witnesses; his right to testify or to not testify; his right to a jury

19  determination of aggravating circumstances; and his right to appeal. (*Id.* at 15–16.)  (*Id.*

20  at 16.)  After this colloquy between the Court and Petitioner, Petitioner pleaded guilty to

21  Count I and Count II.  (*Id.* at 17.)

22  Petitioner's counsel then provided the factual basis for both Counts:

23  THE COURT: Is there a factual basis for the plea?

24  MS. WILLMOTT: There is, Your Honor.  As to Count I, on or between
    July 10th to July 11th, 2009, within Maricopa County, in Phoenix, with
25  premeditation, Mr. Pringle caused the death of Alice Saunders.

26  As to Count 2, on or between July 10th to July 11th, 2009, within
    Maricopa County, in Phoenix, Mr. Pringle knowingly controlled Alice
27  Saunders' car without her permission.

28  THE COURT: Mr. Beaty, any additions or corrections ot the factual basis
    as set forth by the defense?

- 5 -

MR. BEATY:  No additions or corrections, and victims rights are complied with.

THE COURT:  Mr. Pringle, you have heard your lawyer describe for me what happened.  Is that, in fact, what happened?

THE DEFENDANT: Yes.

THE COURT: Does either lawyer have any concerns about the voluntariness of this plea?

MR. BEATY: No, Judge.

MS. WILLMOTT: No, Your Honor.

(*Id.* at 17-18.)  The Court accepted and entered Petitioner's guilty plea.  (*Id.* at 18.)

On March 7, 8, and 9, 2011, the trial court held a three-day sentencing hearing. During the hearing, the Court heard testimony from witnesses, statements from the victim's family, and testimony from Petitioner's family and other witnesses who knew Petitioner.  (Doc. 22-8, Ex. II, Doc. 22-9, Ex. JJ and KK.)  The Court also considered documents submitted by the parties, including a report by a specialist in clinical, forensic, and neuropsychology and a deviation packet submitted by defense counsel.  (Doc. 22-2, Ex. N, Doc. 22-3, 4, 5, Ex. O, Doc. 22-6, Ex. P.)  After considering all of the testimony and documents, and hearing argument from the parties, the Court sentenced Petitioner to a natural-life sentence for the murder charge, and an aggravated sentence of 8 years' imprisonment for the theft charge. (Doc. 22-8, Ex. KK at 5-39.)  The Court found that given the "nature and circumstances of" the offense, Petitioner should not be released. (Doc. 22-8, Ex. KK at 36-68.)

### c.  Of-Right Post-Conviction Relief

On April 6, 2011, Petitioner timely filed a notice of his "of-right" PCR Petition. (Doc. 22-6, Ex. R.)  On May 12, 2011, the PCR court appointed counsel for Petitioner. (Doc. 22-6, Ex. S.)  On December 29, 2011, appointed counsel filed a notice that he was "unable to find any claims for relief to raise" in the PCR proceedings.  (Doc. 22-6, Ex. Y.)  Appointed counsel sought, and the Court granted, additional time for Petitioner to file a pro per PCR Petition.  (Doc. 22-6, Exs. Y & Z.)

On January 22, 2012, Petitioner filed a PCR petition. (Doc. 22-7, Ex. AA.) Among numerous claims, Petitioner asserted similar claims presented in the instant Petition. Petitioner argued (1) trial counsel was incompetent because counsel refused to challenge the grounds for the first-degree murder charge and "led him to believe that the only way [he] could get a lesser charge was to sign the plea" (Doc. 22-7, Ex. AA at 40); (2) his interview with the detective was "tainted" because he was "intoxicated" and "confused" (*Id*. at 26); and, (3) the "state presented no evidence whatsoever to support its charge of premeditated first degree murder (*Id*. at 13).

On April 10, 2012, the trial court summarily denied the PCR petition, stating: "The Court has received and reviewed Defendant's Petition for Post-Conviction Relief, the Response, and the Reply. The Court finds that Defendant has failed to set forth a colorable claim to vacate his guilty plea or reduce the sentence imposed." (Doc. 22-7, Ex. DD at 72.)

### d.  Arizona Court of Appeals

On April 23, 2012, Petitioner filed a Petition for Review with Arizona Court of Appeals. (Doc. 22-7, Ex. DD at 69.) Among other arguments, Petitioner asserted (1) he pleaded under duress because trial counsel told him he would receive the death penalty because of his race, (2) his statements to the detective were improperly obtained, and (3) there was insufficient evidence of first degree murder. (Doc. 22-7, Ex. DD at 69-71.) On July 25, 2013, Arizona Court of Appeals granted review but denied relief in a six-page memorandum opinion. (Doc. 22-7, Ex. GG at 90.)

The court rejected Petitioner's claim of ineffective assistance of counsel, stating: "The allegations in Pringle's petition were insufficient to show that counsel's advice to accept the plea agreement here, which allowed Pringle to avoid facing the death penalty, was outside the range of competence. Indeed, most of Pringle's complaints about counsel's performance relate to matters of strategy." (Doc. 22-7, Ex. GG at 94.) The court also found that Petitioner's claim of a "tainted" interview was waived due to Petitioner's guilty plea. (*Id*. at 92.) The court further determined that Petitioner's express

admission of premeditated murder satisfied the burden of proof regarding the offense. (*Id.* at 93.)

### e.  Arizona Supreme Court

On August 9, 2013, Petitioner filed a Petition for Review with the Arizona Supreme Court. (Doc. 22-7, Ex. GG at 86-89.) On February 11, 2014, the Arizona Supreme Court summarily denied review. (Doc. 1 at 19.)

### f.  Petition for Writ of Habeas Corpus

On April 14, 2015, Petitioner filed this Petition for Writ of Habeas Corpus, asserting three Grounds for Relief:

> **Ground One**: Counsel was ineffective by (1) erroneously advising him to accept a plea because he could "not get a fair trial" due to his race; (2) deciding "it would be a waste of time to prepare a proper defense" and thus counsel pressured Petitioner to accept the plea; and (3) advising Petitioner take the plea if Petitioner "wanted to live."
>
> **Ground Two**: The detective conducted a "tainted" interview of Defendant and extracted "corrupt" information that was improperly used to secure a first-degree murder charge against Petitioner.
>
> **Ground Three**: The State had insufficient evidence "to support its charge of premeditated or first degree murder."

(Doc. 1 at 6-8.)

The Petition is timely, and Petitioner exhausted these claims in prior proceedings.

## II.   Analysis

### a.  Standard of Review

The writ of habeas corpus affords relief to persons in custody pursuant to the judgment of a state court in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. §§ 224l(c)(3), 2254(a). Petitions for Habeas Corpus are governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). 28 U.S.C. § 2244.

The Court may not grant a writ of habeas corpus to a state prisoner on a claim adjudicated on the merits in state court proceedings unless the state court reached a decision which was contrary to clearly established federal law, or the state court decision was an unreasonable application of clearly established federal law.  *See* 28 U.S.C. §

2254(d); *Davis v. Ayala*, 135 S.Ct. 2187, 2198-99 (2015); *Musladin v. Lamarque*, 555 F.3d 834, 838 (9th Cir. 2009). The AEDPA requires that the habeas court review the "last reasoned decision" from the state court, "which means that when the final state court decision contains no reasoning, we may look to the last decision from the state court that provides a reasoned explanation of the issue." *Murray v. Schriro*, 746 F.3d at 441 (quoting *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000)).

> Clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions. And an unreasonable application of those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice. Rather, as a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement.

*White v. Woodall*, 134 S.Ct. 1697, 1702 (2014) (internal citations and quotations omitted). *See also Arrendondo*, 763 F.3d at 1133-34.

> Recognizing the duty and ability of our state-court colleagues to adjudicate claims of constitutional wrong, AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court. AEDPA requires "a state prisoner [to] show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error . . . beyond any possibility for fair minded disagreement." *Harrington v. Richter*, [] 131 S.Ct. 770, 786–787, [] (2011). "If this standard is difficult to meet"—and it is—"that is because it was meant to be." [] 131 S.Ct., at 786. We will not lightly conclude that a State's criminal justice system has experienced the "extreme malfunctio[n]" for which federal habeas relief is the remedy. *Id.*, at ——, 131 S.Ct., at 786 (internal quotation marks omitted).

*Burt v. Titlow*, 134 S.Ct. 10, 15-16 (2013).

A state court decision is contrary to federal law if it applied a rule contradicting the governing law as stated in United States Supreme Court opinions, or if it confronts a set of facts that is materially indistinguishable from a decision of the Supreme Court but reaches a different result. *Brown v. Payton*, 544 U.S. 133, 141 (2005).

A state court decision involves an unreasonable application of clearly established

federal law if it correctly identifies a governing rule but applies it to a new set of facts in a way that is objectively unreasonable, or if it extends, or fails to extend, a clearly established legal principle to a new set of facts in a way that is objectively unreasonable. *See McNeal v. Adams*, 623 F.3d 1283, 1287–88 (9th Cir. 2010). The state court's determination of a habeas claim may be set aside under the unreasonable application prong if, under clearly established federal law, the state court was "unreasonable in refusing to extend [a] governing legal principle to a context in which the principle should have controlled." *Ramdass v. Angelone*, 530 U.S. 156, 166 (2000). However, the state court's decision is an unreasonable application of clearly established federal law only if it can be considered objectively unreasonable. *See, e.g., Renico v. Lett*, 559 U.S. 766, 130 S. Ct. 1855, 1862 (2010). An unreasonable application of law is different from an incorrect one. *See Renico*, 130 S. Ct. at 1862; *Cooks v. Newland*, 395 F.3d 1077, 1080 (9th Cir. 2005). "That test is an objective one and does not permit a court to grant relief simply because the state court might have incorrectly applied federal law to the facts of a certain case." *Adamson v. Cathel*, 633 F.3d 248, 255–56 (3d Cir. 2011). *See also Howard v. Clark*, 608 F.3d 563, 567–68 (9th Cir. 2010).

Factual findings of a state court are presumed to be correct and can be reversed by a federal habeas court only when the federal court is presented with clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Brumfield v. Cain*, 135 S.Ct. 2269, 2277 (2015). The "presumption of correctness is equally applicable when a state appellate court, as opposed to a state trial court, makes the finding of fact." *Sumner v. Mata*, 455 U.S. 591, 593 (1982). *See also Phillips v. Ornoski*, 673 F.3d 1168, 1202 n.13 (9th Cir. 2012).

Additionally, the United States Supreme Court has held that, with regard to claims adjudicated on the merits in the state courts, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). *See also Murray*, 745 F.3d at 998. Pursuant to section 2254(d)(2), the "unreasonable determination" clause, "a state-court's factual determination is not unreasonable merely because the federal habeas court would have

reached a different conclusion in the first instance." *Burt*, 134 S.Ct. at 15 (internal quotation marks and citation omitted) (quoted by *Clark v. Arnold*, 769 F.3d 711, 724-25 (9th Cir. 2014)).

If the Court determines that the state court's decision was an objectively unreasonable application of clearly established United States Supreme Court precedent, the Court must review whether Petitioner's constitutional rights were violated, i.e., the state's ultimate denial of relief, without the deference to the state court's decision that the AEDPA otherwise requires. *See Lafler*, 132 S. Ct. 1389-90; *Panetti v. Quarterman*, 551 U.S. 930, 953–54 (2007). Additionally, the petitioner must show the error was not harmless: "For reasons of finality, comity, and federalism, habeas petitioners are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Davis v. Ayala*, 135 S.Ct. 2187, 2197 (2015) (internal quotations omitted).

### b.  Ground One

#### i.  *Strickland* **and Ineffective Assistance of Counsel**

The Supreme Court established a two-part test for evaluating ineffective assistance of counsel claims in *Strickland v. Washington*, 466 U.S. 668 (1984).  The *Strickland* test applies to a federal habeas petitioner's challenge to a conviction entered upon a guilty plea. *See, e.g.*, *Hill v. Lockhart*, 474 U.S. 52, 58-59 (1985); *Washington v. Lampert*, 422 F.3d 864, 872 (9th Cir. 2005).  In such a context, "the ineffectiveness inquiry probes whether the alleged ineffective assistance impinged on the [petitioner's] ability to enter an intelligent, knowing and voluntary plea of guilty." *Lambert*, 393 F.3d at 980. To prevail on this claim, Petitioner must show that his counsel's representation fell below the range of competence demanded of counsel in criminal cases and that he suffered actual prejudice as a result of counsel's incompetence. *Id.* at 873.  Because a petitioner's failure to make the required showing of either deficient performance or prejudice defeats the claim, the court need not address both factors where one is lacking. *Strickland*, 466 U.S. at 697–700.

1
2
3
4
5

> In *Hill*, the Supreme Court adapted the two-part *Strickland* standard to challenges to guilty pleas based on ineffective assistance of counsel, holding that a defendant seeking to challenge the validity of his guilty plea on the ground of ineffective assistance of counsel must show that (1) his "counsel's representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for [his] counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." 474 U.S. at 57-59, 106 S. Ct. 366.

6

*Womack v. Del Papa*, 497 F.3d 998, 1002 (9th Cir. 2007).

7
8

> **ii.  Petitioner was not denied his federal constitutional right to the effective assistance of counsel.**

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

The Arizona Court of Appeals reasonably applied *Strickland* to the facts of Petitioner's case.  Petitioner argued to the Court of Appeals that his attorney told him "that my being black and in Arizona, that I would surely lose the trial and would get the death penalty." (Doc. 22-7, Ex. DD at 71.) On May 10, 2013, Petitioner's counsel wrote him a letter rejecting this claim. Counsel stated: "There were a lot of reasons I advised you to accept the plea. The most important was the brutality of the crime. We talked about your pod mate who was sentenced to death for a similar stabbing…. I am sure I mentioned the fact that you are black and Arizona was not the best place for a black man to get a fair trial. However, that was not the reason I advised you to take the plea." (Doc. 1-1 at 4.) The Arizona Court of Appeals properly concluded that these strategic discussions between Petitioner and his counsel did not establish ineffective assistance of counsel.  The Court of Appeals decision cited to *State v. Beaty*, 158 Ariz. 232, 250 (1988) ("Matters of trial strategy and tactics are committed to defense counsel's judgment" and cannot serve as the basis for a claim of ineffective assistance of counsel). (Doc. 22-7, Ex. GG at 94.) *See also*, *Strickland*, 466 U.S. at 690-91 ("strategic decisions made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable").

26

Here, the state courts' determination that the discussion of race was not ineffective

27
28

assistance of counsel was not unreasonable.[2]   Petitioner claims that counsel was "erroneous" for advising him to plead guilty.  Due to the weight of the evidence against Petitioner (discussed *infra*), this strategic advice was not ineffective assistance.

Petitioner also has not satisfied the prejudice prong of the ineffective assistance of counsel test. To satisfy the prejudice prong, a petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Where ineffective assistance leads a petitioner to accept a plea offer, a different result means that "but for counsel's errors, [Petitioner] would either have gone to trial or received a better plea bargain." *United States v. Howard*, 381 F.3d 873, 882 (9th Cir. 2004).  Petitioner has not established a reasonable probability that he would have gone to trial in the face of the death penalty allegation and the strength of the state's case.

Petitioner also claims that counsel advised "it would be a waste of time to prepare a proper defense" and thus counsel pressured Petitioner to accept the plea.  The record demonstrates that counsel spent considerable effort on Petitioner's behalf. Counsel prepared a 137-page deviation packet that was presented to the state prosecutor. (Doc. 22-2, Ex. N at 65-202.) Counsel's negotiation resulted in a plea offer that dismissed the death penalty allegation and did not stipulate to a natural-life sentence. (Doc. 22-1, Ex. M at 79-82.) Counsel spoke with Petitioner on seven occasions in the two months prior to the plea hearing. (Doc. 1-1 at 4.)  Petitioner signed a plea agreement avowing his plea was voluntary and not coerced. (Doc. 22-1, Ex. M. at 82.) Petitioner's statements in court are entitled to considerable weight. *See Blackledge v. Allison*, 431 U.S. 63, 74 (1977) ("Solemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible"). The

___

[2] The discussion of race in death penalty litigation is not novel. *See McCleskey v. Kemp*, 481 U.S. 279, 287 (1987) (discussing a study indicating that black defendants who kill white victims have the greatest likelihood of receiving the death penalty); *United States v. Lee*, 715 F.3d 215, 223 (8th Cir. 2013) ("Counsel's race based jury selection strategy" was not ineffective assistance).

Arizona Court of Appeals determination was not contrary to nor an unreasonable application of federal law.

Petitioner's final claim is that counsel was unwilling "to fight for" him and erroneously advised him to plead guilty if "he wanted to live." (Doc. 1 at 6.) As discussed above, the record demonstrates that counsel conducted significant investigation of the case prior to the plea agreement. Counsel did not provide ineffective assistance by recommending Petitioner plead guilty to first-degree murder in exchange for (1) the government dismissing the death penalty allegation, and (2) the trial court retaining discretion regarding the sentence (natural life versus the possibility of parole after 25 years imprisonment). *See Premo v. Moore*, 562 U.S. 115, 127 (2011), which provides the following:

> Moore's prospects at trial were thus anything but certain. Even now, he does not deny any involvement in the kidnaping and killing. In these circumstances, and with a potential capital charge lurking, Moore's counsel made a reasonable choice to opt for a quick plea bargain. At the very least, the state court would not have been unreasonable to so conclude. Cf. *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) (explaining that state courts enjoy "more leeway" under AEDPA in applying general standards).

The state court's conclusion that Petitioner was not denied his right to the effective assistance of counsel was neither contrary to nor an unreasonable application of federal law.

### c.  Ground Two: Petitioner waived his "tainted" interview argument.

Petitioner's claim that his statements were improperly obtained during a "tainted" police interview (Doc. 1 at 7) was waived by Petitioner's guilty plea. "When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea." *Tollett v. Henderson*, 411 U.S. 258, 267 (1972). Aside from a challenge to the voluntary and intelligent character of the plea itself, the entry of a guilty plea generally forecloses all collateral attacks with the exception of jurisdictional claims. *United States v. Broce*,

488 U.S. 563, 574 (1988).  Petitioner's claim is not cognizable. *Tollett*, 411 U.S. at 267.

### d. Ground Three: Petitioner's guilty plea, and the evidence in the case, provided sufficient evidence of premeditation.

Petitioner's assertion that there was a lack of evidence of premeditation is meritless.  Petitioner claims now, as he did with the state courts, that there was insufficient evidence of premeditation in the case, and thus he should be resentenced for Second Degree Murder.  (Doc. 1 at 8.)   The Arizona Court of Appeals rejected this argument, noting that Petitioner admitted "he had 'with premeditation . . . caused the death of' the victim…." (Doc. 22-7, Ex. GG at 93.)

Petitioner admitted to premeditated murder.  Although his factual basis supplied the admission to premeditation, the factual basis was not required.  "We conclude that the due process clause does not impose on a state court the duty to establish a factual basis for a guilty plea absent special circumstances." *Rodriguez v. Ricketts*, 777 F.2d 527, 528 (9th Cir. 1985).  Petitioner cannot now attack the validity of his plea. "It is well settled that a voluntary and intelligent plea of guilty made by an accused person, who has been advised by competent counsel, may not be collaterally attacked." *Mabry v. Johnson*, 467 U.S. 504, 508-09 (1984) (footnote with citations omitted). *See also*, *United States v. Mathews*, 833 F.2d 161, 165 (9th Cir. 1987) (finding that defendant could not collaterally attack his guilty plea "because his challenge is to the factual basis of the plea-not to its consensual character"). The Arizona Court of Appeals' rejection of this argument was not contrary to clearly established federal law.

This Court's review of the evidence establishes evidence of premeditation.

"Premeditation" means that the defendant acts with either the intention or the knowledge that he will kill another human being, when such intention or knowledge precedes the killing by any length of time to permit reflection. Proof of actual reflection is not required, but an act is not done with premeditation if it is the instant effect of a sudden quarrel or heat of passion.

Ariz. Rev. Stat. § 13–1101(1). Here, Petitioner and victim had an argument that precipitated the murder. (Doc. 22-5, Ex. O at 99.) Petitioner picked up a mallet from one bedroom of the residence and went to the victim's bedroom. (*Id*. at 100.) Petitioner

"pushed open" the victim's door and found the victim lying on the bed. (*Id*. at 101.) Petitioner approached the victim, struck her repeatedly with the mallet, and inflicted 30 head wounds. (*Id*.; Doc. 22-9, Ex. JJ. at 154.) Petitioner told the detective that the victim "wouldn't die" from these wounds, so Petitioner found a knife on a counter in the victim's bedroom. (Doc. 22-5, Ex. O-3 at 103.) Petitioner pushed the knife through the victim's neck. (*Id*. at 105.) Petitioner saw blood come out of the victim's mouth after the stabbing. (*Id*.) Petitioner stood over the victim and smoked a cigarette. (*Id*. at 108.) Petitioner took the mallet and knife and washed them with water. (*Id*. at 105.) Petitioner fled the scene. (*Id*. at 111.)   A resident of the house told police that the victim and Petitioner previously fought. (Doc. 22-2, Ex. N at 84.)   The witness described a prior fight where the Petitioner threatened to kill the victim.  (*Id*. at 83-84.)  In sum, there was evidence of premeditation.

## CONCLUSION

The record is sufficiently developed and the Court does not find that an evidentiary hearing is necessary for resolution of this matter. *See Rhoades v. Henry*, 638 F.3d 1027, 1041 (9th Cir. 2011); *Roberts v. Marshall*, 627 F.3d 768, 773 (9th Cir. 2010). The Court will therefore recommend that the Petition for Writ of Habeas Corpus (Doc. 1) be denied and dismissed with prejudice.

**IT IS THEREFORE RECOMMENDED** that the Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) be **DENIED** and **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER RECOMMENDED** that a Certificate of Appealability and leave to proceed *in forma pauperis* on appeal be **DENIED** because the dismissal of the Petition is justified by a plain procedural bar and jurists of reason would not find the procedural ruling debatable.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment. The

parties shall have 14 days from the date of service of a copy of this Report and Recommendation within which to file specific written objections with the Court. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(b) and 72. Thereafter, the parties have 14 days within which to file a response to the objections.

Failure to timely file objections to the Magistrate Judge's Report and Recommendation may result in the acceptance of the Report and Recommendation by the district court without further review. *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003). Failure to timely file objections to any factual determinations of the Magistrate Judge will be considered a waiver of a party's right to appellate review of the findings of fact in an order of judgment entered pursuant to the Magistrate Judge's Report and Recommendation. *See* Fed. R. Civ. P. 72.

Dated this 28th day of August, 2015.


Honorable John Z. Boyle
United States Magistrate Judge